UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:15-CR-00034 (JAM) |
|---|---|---|
| v. | : | |
| RANDI FELICIANO | : | February 14, 2017 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government respectfully submits this memorandum in connection with the sentencing of defendant Randi Feliciano ("Feliciano" or "Defendant"), which is currently scheduled for February 21, 2017.

**Background**

**I.     Factual background**

On December 13, 2014, Feliciano and his father, Bomani Africa, committed an armed robbery of First Niagra Bank located at 225 Hawley Lane in Stratford, Connecticut. On that date, Feliciano and Africa entered the bank wearing masks and brandishing fake guns and, after terrifying the bank's employees and customers, successfully stole approximately $15,635.

The First Niagra Bank robbery was not Feliciano's first. Together with Africa and another co-conspirator named George Bratsenis, Feliciano also participated in the armed robbery of People's United Bank in Trumbull, Connecticut on September 26, 2014, just a few months prior to the First Niagra Bank robbery to which he has pleaded guilty. During the People's United Bank robbery, Bratsenis and Africa – this time armed with real weapons – entered the bank and forcibly stole approximately $29,937. Feliciano helped Bratsenis and Africa complete the

1

robbery by, among other things, driving Africa to and from Connecticut to participate in the robbery.

Feliciano claims in his sentencing memorandum that he "did not know about the intended robbery of the Peoples [sic] bank in Trumbull, CT until it was almost over." (Doc. 147 at 2.) He claims that he drove his father from Pennsylvania to Connecticut knowing only "that an opportunity had presented itself to his father to procure some money which would help Mr. Feliciano deal with his financial pressures." (*See id*.) He does not deny that he received a $6,000 share of the $29,937 in robbery proceeds (*see id*.), which is corroborated by a series of text messages Feliciano sent to a friend, his girlfriend and his uncle following the Trumbull robbery.[1]

---

[1] At 2:29 p.m. on September 26, 2014 – the day of the Trumbull robbery – Feliciano received a text message from a contact named "Migel" (i.e., Miguel Rodrigeuz) who wrote, "U got that bread." At 2:57 p.m., Feliciano responded, "Yea my g." Also on the afternoon of September 26, 2014, Feliciano had the following text message exchange with a contact named "My Love Girl" (i.e., his girlfriend):

| | |
|---|---|
| Feliciano: | Get ready wee going to have some fun (4:21 p.m.) |
| Feliciano: | And I got some money for u so u can pay ur bills I told u I got u baby (4:24 p.m) |
| My Love Girl: | Okay babe. But I got some shxt to do today (4:26 p.m.) |
| Feliciano: | Ok hurry and handle that because wee going to get a house today (4:27 p.m.) |
| Feliciano: | Wee going to get somting nice 1 for u I got the money for it today (5:04 p.m.) |
| My Love Girl: | Like an actual house? (5:04 p.m.) |
| Feliciano: | Lol yea a real house for u baby (5:06 p.m.) |
| My Love Girl: | Okay. How much money is this? Like what you do babe? Lol |

Feliciano's claimed ignorance is directly contradicted by information supplied by a cooperating witness ("CW-1"), whom the Government would have called at trial to testify that:

- In the early morning hours of September 25, 2014, Feliciano used his black Jeep Grand Cherokee to drive Africa from Pennsylvania to Connecticut for the purpose of robbing the People's United Bank in Trumbull;

- After arriving in Connecticut, Feliciano drove Africa to a parking lot in Trumbull, Connecticut, where Africa stole at gunpoint a silver Ford Fusion from a victim with the initials D.S.;

- After the carjacking, Feliciano and Africa met with Bratsenis to discuss the planned robbery;

- On September 26, 2014, Feliciano waited inside his Jeep in a parking lot near the People's United Bank while Bratsenis and Africa, each wearing a mask and brandishing a gun, entered the bank and forcibly stole approximately $29,937;

- Feliciano then used his Jeep to drive Africa away from the scene, as Africa laid low in the back of Jeep and changed his clothes and Bratsenis set the stolen car that he and Africa used to drive to and from the bank on fire;

- Feliciano and Africa followed Bratsenis to a Greek restaurant in Norwalk, where Africa and Bratsenis talked about the robbery and the three men divided the proceeds; and

- Feliciano then drove Africa back to Philadelphia.

Even assuming that Feliciano did not know he was taking Africa to Connecticut to rob a bank, he certainly learned about it once he got here. According to CW-1, Feliciano was present

---

Feliciano: 2 or 3 monts (5:14 p.m.)

Feliciano: I got 3 monts for are house (7:07 p.m.)

Finally, on the evening of September 26, 2014, Feliciano sent a text message to a contact listed as "Unk Ralph" (i.e., Ralph Feliciano) which read, "Wasup unk ralph wana see if u around I wana give you some money." The Government believes that, in each of these messages, Feliciano was referring to proceeds from the bank robbery that took place earlier that day.

3

at the scene of the carjacking the day before the robbery, at the meeting with Bratsenis that followed the carjacking, in a nearby parking lot just prior to the robbery when Bratsenis and Africa put masks over their faces and carried guns into the stolen car they used to drive to the bank, in the parking lot just after the robbery when Bratsenis set the stolen car on fire and Africa changed out of the clothes he wore into the bank, and at the diner with Bratsenis and Africa while the two men discussed how the robbery went down and divided up the money. Feliciano's claim that he did not understand, at any point in this series of events, that he was assisting Africa in an armed robbery is simply not credible.

## II.     Procedural history

On September 28, 2016, Feliciano pleaded guilty to Count Five of the Fourth Superseding Indictment charging him with Armed Bank Robbery, in violation of 18 U.S.C. §§ 2113(a), 2113(d) and 2. The parties agreed in their plea agreement that: (1) the defendant fell within Criminal History Category I; (2) the defendant's adjusted offense level was 26; and (3) two levels would be subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, for a total offense level of 24. The offense level computation was based on a loss amount of more than $20,000 but less than $95,000, pursuant to U.S.S.G. §§ 2B3.1(b)(7)(B) and 1B1.3, which aggregated the loss amounts from the First Niagra Bank (Stratford) and People's United Bank (Trumbull) robberies. The parties further agreed that a total offense level of 24 in Criminal History Category I resulted in a Guideline range of imprisonment of 51 to 63 months. Finally, the parties agreed that neither party would seek a departure, or any other adjustment not set forth in the plea agreement.

**III.    The Presentence Report**

On February 3, 2017, the Probation Department issued a Presentence Report ("PSR") that found the defendant's applicable base offense level, under Chapter Three of the Sentencing Guidelines, to be a level 25.  PSR ¶ 28.  Probation concluded that Feliciano could not be held responsible for the loss suffered by People's United Bank, as stipulated by the parties, since he did not plead guilty to that robbery or otherwise admit his knowing involvement in it.  PSR ¶ 65.  The PSR subtracted two levels, under § 3E1.1(a), for acceptance of responsibility, resulting in a total offense level of 23.  PSR ¶¶ 30-31.  Finally, the PSR concluded that the defendant fell within Criminal History Category I.  PSR ¶ 35.  As a result, the PSR concluded that the defendant faces a Guideline sentencing range of 46 to 57 months' imprisonment.  PSR ¶ 65.

**Argument**

**The Guideline Range Set Forth in the Presentence Report
Is a Reasonable Sentence in Light of the Sentencing Factors**

**A.  Governing Law**

Although application of the United States Sentencing Guidelines is no longer mandatory, *see United States v. Booker*, 543 U.S. 220 (2005), in each case, "the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a)" in arriving at a reasonable sentence.  *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements.").  Thus, the sentencing court must now first determine the applicable Guidelines range (including any departures), and thereafter, determine whether in light of the Guidelines and

the other factors listed in section 3553(a), there is any reason to impose a non-Guidelines sentence. As the Second Circuit explained, "*Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. Both the Supreme Court and the Court of Appeals expect "sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a), . . . and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice." *Crosby*, 397 F.3d at 113-114.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B) to afford adequate deterrence to criminal conduct;

  (C) to protect the public from further crimes of the defendant; and

  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In *United States v. Crosby*, 397 F.3d at 111-13, the Second Circuit explained that, in light of *Booker*, district courts should now engage in a three-step sentencing procedure. First, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 111-12; *see also United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007) (post-*Booker* district courts maintain a statutory obligation to consider the Guidelines). Second, the district court should consider whether a departure from that Guidelines range is appropriate. *Crosby*, 397 F.3d at 112. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to be imposed. *Id*. at 112-13; *see also United States v. Salazar*, 489 F.3d at 557 (holding, "the discretion afforded district judges by *Booker* applies to their consideration of the Guidelines range as one of the § 3553(a) factors *after* that range has been calculated") (emphasis in original). The fact that the Sentencing Guidelines are no longer mandatory does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. A failure to consider the Guidelines range and to instead simply select a sentence without such consideration is error. *Id*. at 115; *see also United States v. Cuevas*, 496 F.3d 256, 265 (2d Cir. 2007) (explaining district courts have a duty "to consider the

7

applicable Guidelines range, in addition to the other factors listed in 18 U.S.C. § 3553(a), in determining the appropriate sentence").

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court explained that "[b]ecause the Guidelines are now advisory, appellate review of sentencing decisions is limited to determining whether they are 'reasonable' [citation omitted] and an abuse of discretion standard applies. . . ." *Gall*, 552 U.S. at 45. Further, a district judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts of the case." *Id*. In so doing, the sentencing judge "must consider the extent of any departure from the Guidelines and must explain the appropriateness of any unusually lenient or harsh sentence with sufficient justifications." *Id*.

C. **Application of the Law to Feliciano's case**

The Government believes a sentence within the Guidelines range set forth in the plea agreement is appropriate in light of the seriousness of the offense and the need for the sentence imposed to deter the Defendant and others from committing similar crimes, promote respect for the law, and provide just punishment. The Government does not seek imposition of a fine; it does, however, intend to seek restitution.

1. **Seriousness of the Offense**

The offense that Feliciano committed – the armed robbery of a financial institution – was extremely serious. Though the weapon he brandished during the course of the robbery was not real, the employees and customers who were staring into the face of the weapon did not know it was fake. They thought the masked men in front of them were carrying real guns, which they might decide to fire at any minute. It was a terrifying experience that the victims will remember

for the rest of their lives. Feliciano's infliction of a lasting, psychological harm on the robbery victims militates in favor of serious punishment.

### 2. Goals of Federal Sentencing: Deterrence and the Need to Promote Respect for the Law, Provide Just Punishment and Protect the Public

A sentence within the stipulated Guidelines range is also necessary to deter Feliciano from committing future crime. Though he has accepted responsibility for the robbery to which he pleaded guilty, he continues to deny his knowing participation in the robbery of People's United Bank in Trumbull. He does not dispute that he was at the scene or that he shared in the robbery proceeds – as he knows the Government can prove those facts readily – but claims he did not know he was helping Africa participate in an armed robbery. As discussed above, the notion that Feliciano did not know that he was helping Africa participate in the armed robbery in Trumbull is simply not credible and directly contradicted by the information supplied by CW-1. In the Government's view, Feliciano's persistence in denying his knowing participation in the Trumbull robbery suggests a belief that he can game the justice system. And if Feliciano in fact has that belief, then a lengthy term of incarceration is especially necessary to correct it.

The goal of promoting respect for the law also justifies a sentence within the guidelines range. The fact that Feliciano traveled to Connecticut on two separate occasions to commit armed robberies of two separate banks illustrates a striking disrespect for the law. A stringent sentence of imprisonment within the range recommended by the guidelines is warranted to promote respect for the law in the future. The victims of the robberies also deserve a significant sentence to provide just punishment.

Finally, the goal of general deterrence is important here. People in Feliciano's position

need to understand that if they steal to make easy money – and jeopardize the lives of others while doing it – the consequences will be severe. A sentence within the guidelines range would send a pronounced deterrent message to others involved in carrying out robberies across the country and to persons who may be tempted to do so in the future.

**D. <u>The Court Should Give Effect to the Parties' Plea Agreement</u>**

As a final matter, the Government respectfully asks the Court to look to the advisory Guidelines range set forth in the plea agreement when considering what sentence to impose on Feliciano. As noted above, Probation has calculated the advisory Guidelines range to be 46 to 57 months, as opposed to the 51 to 63-month range to which the parties stipulated in the plea agreement, based on the conclusion that only the loss suffered by First Niagra Bank in Stratford (and not the additional loss suffered by People's United Bank in Trumbull) should be considered when determining Feliciano's offense level under the Guidelines. Under Section 1B1.3(a)(1)(A) of the Guidelines, the Court may consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" in determining the defendant's base offense level. In this case, Feliciano admits that he drove Africa from Pennsylvania to Connecticut on the day of the Trumbull carjacking, that he drove Africa back to Pennsylvania after the robbery, and that he shared in the robbery proceeds. These "acts and omissions committed, aided [and] abetted" by him are therefore properly considered under Section 1B1.3(a)(1)(A).

Even, however, if the Court determines that Feliciano's conduct in connection with the Trumbull robbery should not be considered for purposes of determining his offense level under Section 1B1.3(a)(1)(A), the Government nonetheless requests that the Court give effect to the

parties' plea agreement. Feliciano's agreement to take responsibility for the $29,937 loss suffered by People's United Bank was an important factor in the Government's decision to permit him to plead guilty only to the First Niagra Bank robbery. Indeed, Feliciano states in his sentencing memorandum that he "has insisted on bearing responsibility for paying back the money from the Trumbull robbery, since he received some of the proceeds." As such, the Government submits that the Court take into account the loss suffered by People's United Bank in fashioning Feliciano's sentence, as the parties agreed was appropriate.

***

For the reasons above, the Government respectfully submits that a sentence within the advisory Guideline range set forth in the plea agreement is reasonable and no more than necessary to achieve the goals of Section 3553.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ *Amy C. Brown*
AMY C. BROWN
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct29771
United States Attorney's Office
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT 06604
(203) 696-3039

**CERTIFICATE OF SERVICE**

  I hereby certify that on February 14, 2017, a copy of the foregoing was filed electronically, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

               /s/ *Amy C. Brown*
               _____
               AMY C. BROWN
               ASSISTANT U.S. ATTORNEY